UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*3:20mJ 856 RAR*

STATE OF CONNECTICUT          :          **FILED UNDER SEAL**

                              :          ss: Hartford, Connecticut

COUNTY OF HARTFORD           :

**AFFIDAVIT OF JEFFREY W. ANDERSON**

I, Jeffrey W. Anderson, a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General, having been duly sworn, state the following:

1.      I am a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), where I have been employed since July 2015.  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, and I have a Bachelor of Science in Business Administration from the Whittemore School of Business, University of New Hampshire in 2010.  Before becoming a Special Agent, I was employed as an auditor with HHS-OIG for five years.

2.      As an HHS-OIG Special Agent, I am responsible for investigating allegations of fraud against the various programs under HHS's jurisdiction, including the Medicare and Medicaid programs. I have participated in numerous investigations involving those programs and have interviewed witnesses, conducted surveillance, reviewed claims data, medical records and other business records. I have also assisted with the execution of search and arrest warrants.

3.      Along with other Special Agents from HHS-OIG and the Federal Bureau of Investigation ("FBI"), I am investigating an individual named CORTNEY DUNLAP ("DUNLAP") who is licensed by the State of Connecticut as a licensed professional counselor

("LPC"). DUNLAP owns and operates CORTNEY DUNLAP LPC LLC. Our agencies are investigating allegations that DUNLAP is engaged in a health care fraud scheme to defraud the Connecticut Medicaid Program by submitting fraudulent claims for psychotherapy counseling sessions that in fact were never provided to Medicaid patients.

4.       I submit this affidavit in support of a complaint and arrest warrant alleging that CORTNEY DUNLAP is engaged in a scheme to defraud the Connecticut Medicaid program, in violation of Title 18 U.S.C. §§ 1035 (false statements related to health care matters) and 1347 (health care fraud).

5.       I base this affidavit upon my personal knowledge, upon information and documents provided to me by other investigators assigned to this investigation, and upon information and documents provided by third parties. I have not included each and every fact known to me from the investigation; rather, I have submitted sufficient information to establish probable cause for the complaint and requested warrant.

## I.      BACKGROUND

### A.      The Medicaid Program In Connecticut

6.       The Connecticut Department of Social Services ("DSS") provides medical assistance to low-income persons and people who could otherwise support themselves if not for the fact that they have excessive health care costs. DSS provides this assistance through the Connecticut Medical Assistance Program (CTMAP). CTMAP offers a comprehensive health care benefit package that includes the following:

  a.       HUSKY A - Family Medicaid;

  b.       HUSKY B - State Children's Health Insurance Program ("SCHIP");

  c.       HUSKY C - previously referred to as Medicaid, Title XIX, fee-for-

service, or Adult Medicaid; and

    d.    HUSKY D - previously referred to as Medicaid for Low Income Adults ("MLIA").

7.    The HUSKY programs identified above are joint federal-state government programs designed primarily to finance the provision of the medical services to the indigent. This affidavit refers to the various HUSKY programs above collectively as "Medicaid." DSS administers these Medicaid programs in Connecticut. The Medicaid program is administered at the federal level by the Centers for Medicare and Medicaid Services ("CMS") and is funded approximately 50 percent by the federal government. The remaining approximately 50 percent is funded by the State of Connecticut.

8.    Medicaid is a public plan or contract that pays claims submitted by participating health care providers for medically necessary benefits, items, and services rendered to Medicaid members. As such, Medicaid is a "health care benefit program" under 18 U.S.C. § 24(b).

**B.    Medicaid's Coverage of Behavioral Health Services**

9.    The Connecticut DSS Provider Manual, which sets forth the rules of the Medicaid program, defines "behavioral health clinician services" as "preventive, diagnostic, therapeutic, rehabilitative or palliative services provided by a licensed behavioral health clinician within the licensed behavioral health clinician's scope of practice under state law."

10.    Pursuant to Section 17b-262-916 of Chapter 7 of the Connecticut DSS Provider Manual, Medicaid pays providers "only for behavioral health clinician services that are (1) within the licensed behavioral health clinician's scope of practice as defined by chapters 376b, 383a, 383b, or 383c of the Connecticut General Statutes, as applicable to the behavioral health clinician; and (2) medically necessary to treat the client's condition." The provider manual also

3

states that Medicaid does not pay for "services provided by anyone other than" the licensed provider.

11.     Thus, Medicaid covers only behavioral health services that are provided by licensed health care providers, with a very narrow exception for license-eligible individuals in a behavioral health clinic.  Under Connecticut law, these licensed providers include psychiatrists, psychologists, licensed clinical social workers, licensed professional counselors, licensed family and marriage therapists, and licensed alcohol and drug counselors.

12.      Under Connecticut law, "No person shall provide clinical social work unless such person has obtained a license" as required by law.  "Clinical social work" includes, but is not limited to, counseling, psychotherapy, behavior modification, and mental health counseling.

13.     DSS defines medically necessary services as "those health services required to prevent, identify, diagnose, treat, rehabilitate or ameliorate an individual's medical condition, including mental illness, or its effect, in order to attain or maintain the individual's achievable health and independent functioning."

14.     In order to participate in the Medicaid program, health care providers complete enrollment forms and must provide proof of licensure.  As part of their enrollment, providers certify that they will abide by all applicable federal and state statutes and regulations and will keep accurate and current records regarding the nature, scope, and extent of services furnished to Medicaid recipients.  They also acknowledge prohibitions against the following:

a)     false statements, misrepresentation, concealment, failure to disclose, and conversion of benefits;
b)     any giving or seeking of kickbacks, rebates, or similar remuneration;
c)     charging or receiving reimbursement in excess of that provided by the State; and
d)     false statements or misrepresentation in order to qualify as a provider.

4

15.     Participating providers in the Medicaid program are required to maintain (1) a specific record for all services provided to each client including, but not limited to: name, address, birth date, Medicaid identification number, pertinent diagnostic information, and a current treatment plan signed by the licensed behavioral health clinician; and (2) documentation of services provided, including, types of service or modalities, date of service, location of the service and the start and stop time of the service.  Providers must maintain these records for at least five years from the date of service.

16.     When Medicaid sends payments to providers for services, Medicaid also sends a document called a remittance advice/notice to the provider.  The remittance advice/notice details the amount Medicaid paid or denied for each claim.

17.     Unlike many other health benefit plans, Medicaid does not send Explanation of Benefits (EOB) forms to its members for claims submitted to Medicaid.   As a result, Medicaid members generally do not know if a provider has billed Medicaid for services that the member did not in fact receive.

**C.     How Providers Bill Medicaid: CPT Codes**

18.     In order to bill health care benefit programs such as Medicaid, Medicare, or private health insurance programs, providers use a five-digit number, known as a Current Procedural Terminology ("CPT") code, which identifies the nature and complexity of the service provided. The CPT codes are listed in a manual that is published annually by the American Medical Association.  CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered.  Virtually every medical procedure has its own CPT code and Medicaid and private insurance companies pay a specified amount of money for each CPT code billed.

5

19.    The CPT codes that DUNLAP uses to bill Medicaid are those commonly used by behavioral health clinicians who provide professional counseling services.  These CPT codes include claims for psychotherapy sessions.  According to the American Medical Association, psychotherapy is defined as "the treatment of mental illness and behavioral disturbances in which the physician or other qualified health care professional, through definitive therapeutic communication, attempts to alleviate the emotional disturbances, reverse or change maladaptive patterns of behavior, and encourage personality growth and development."

20.    The CPT manual describes the codes for psychotherapy sessions, and defines the various levels of psychotherapy sessions according to the "times for face-to-face services with [a] patient, and may include informant(s)."  The CPT manual provides that "The patient must be present for a majority of the service."

21.    Since 2013, the CPT manual listed three levels of psychotherapy sessions:  a 30-minute session with a patient; a 45-minute session with a patient; and a 60-minute session with a patient.  Generally speaking, the longer the psychotherapy session, the more that Medicaid or any other health plan pays for the service.

22.    The code most commonly used by DUNLAP to bill Medicaid is described as follows in the CPT manual:

**90837**  Psychotherapy, 60 minutes with patient and/or family

23.    For four patients who were purportedly seen on dates of service between January 9, 2015 and January 25, 2016, DUNLAP also billed Medicaid for services using the following CPT Code:

**90834**  Psychotherapy, 45 minutes with patient

24.     According to the American Psychological Association ("APA"), although the times for CPT psychotherapy codes are specific, the coding manual allows for some flexibility. According to the APA, in general, if the total duration of the psychotherapy session is 38-52 minutes, a provider should choose CPT Code 90834 (the 45-minute code), and if the total duration of the psychotherapy session is 53 or more minutes, the provider should choose CPT Code 90837 (the 60-minute code).

25.     In addition to billing for 60-minute face-to-face psychotherapy counseling sessions, the first time DUNLAP bills Medicaid for a patient, DUNLAP bills the following CPT code:

**90791**  Psychiatric diagnostic evaluation

This code is discussed in the section of the CPT manual describing Psychiatric Diagnostic Procedures, which provides in relevant part as follows:

> Psychiatric diagnostic evaluation is an integrated biopsychosocial assessment, including history, mental status, and recommendations. The evaluation may include communication with family or other sources and review and ordering of diagnostic studies.
> *       *       *
> In certain circumstances, one or more other informants (family members, guardians, or significant others) may be seen in lieu of the patient. Code[] 90791 . . . may be reported more than once for the patient when separate diagnostic evaluations are conducted with the patient and other information. Report services as being provided to the patient and not the informant or other party in such circumstances. . .
> . . . Code[] 90791 [is] used for the diagnostic assessment(s) or reassessment(s), if required, and do not include psychotherapeutic services. Psychotherapy services, including for crisis, may not be reported on the same day.

26.     According to the Centers for Medicare and Medicaid Services, for Medicare patients, a psychiatric diagnostic interview examination under CPT Code 90791 requires (a) elicitation of a complete medical and psychiatric history (including past, family, and social); (b) a mental status examination; (c) establishment of an initial diagnosis; (d) evaluation of the

patient's ability and capacity to respond to treatment; and (e) an initial plan of treatment. Although this Medicare guidance is not binding upon Medicaid programs, public and private health plans often look to Medicare guidance as establishing the proper billing requirements, and it is therefore a useful description of the components of a psychiatric diagnostic evaluation.

## II.    CORTNEY DUNLAP AND CORTNEY DUNLAP LPC LLC

27.    DUNLAP is licensed by the State of Connecticut as a licensed professional counselor ("LPC"), and obtained his license on or about December 5, 2013.

28.    On or about January 2, 2014, DUNLAP enrolled individually as a Behavioral Health Clinician provider in the Connecticut Medicaid Program, with a provider specialty listed as "121 – Professional Counselor." As a result of successfully completing this enrollment application, DUNLAP was assigned a billing provider identification number ending in 143.

29.    In his initial application in 2014, DUNLAP listed the "service location" where counseling services would be provided as located on Latimer Lane in Weatogue, Connecticut, and also provided that same address as his "Home Office Address." In response to inquiries on the provider enrollment application, DUNLAP answered "Yes" when asked "Do you store health records electronically?"

30.    On or about October 16, 2018, as required by Medicaid, DUNLAP submitted a Re-Enrollment Application as a Medicaid provider. In the Re-Enrollment Application, DUNLAP made several changes from his initial provider enrollment, and many of these changes were also noted in a section of the Re-Enrollment Application called "Changes Made During Re-Enrollment." For example, in the Re-Enrollment Application, DUNLAP listed 90 Brainard Road, Suite 105, Hartford, CT as the Service Location where services would be provided, and also provided 90 Brainard Road, Suite 105 as his Home Office Address and Mailing Address.

31.     In the Provider Re-Enrollment Application, DUNLAP noted a change concerning his answer to the question, "Do you store your health records electronically?" noting that the new answer on the Re-Enrollment Application was "No."

32.     In addition, in the Changes Made During Re-Enrollment section, DUNLAP noted a change in his personal address from Plainville, Connecticut to Yorkshire Lane in Avon, Connecticut, and also noted there was no change to the fact that he held 100% of the controlling interest in the provider practice.

33.     DUNLAP electronically signed the Re-Enrollment Application.

34.     On October 30, 2018, an entity named CORTNEY DUNLAP LPC LLC was registered with the Connecticut Secretary of State.  The registered manager of the LLC is listed as CORTNEY DUNLAP, and the primary office address of the LLC is 90 Brainard Rd, Suite 105, Hartford, Connecticut.

35.     On or about October 30, 2018, DUNLAP submitted an Initial Provider Enrollment Application to Medicaid for CORTNEY DUNLAP LPC LLC.  The provider type was listed as "86 – Behavioral Health Clinician Groups," indicating a group practice.  The application listed 90 Brainard Road as the service location, mailing address, and home office address.  In response to the question, "Do you use an Electronic Health Record (EHR) system," DUNLAP stated "No," and in response to the question "Do you store your health records electronically?" also answered "No."

36.     DUNLAP was identified as having 100% of the controlling interest in the group entity seeking enrollment as a provider.  In response to the question, "Does the applicant and/or owner, partner, member or officer have an ownership or controlling interest in any other provider?" however, DUNLAP answered "No," which is inconsistent with his sole ownership of

his individual practice which was already enrolled as a Medicaid provider. DUNLAP electronically signed this application.

37.     On or about November 16, 2018, in a supplement to the Enrollment Application for CORTNEY DUNLAP LPC LLC, DUNLAP sent a fax to Medicaid containing a signed statement on stationery from "CORTNEY DUNLAP LPC" that identified "CORTNEY DUNLAP Owner" that read "I created this LLC in order to change my current sole member NPI . . . to an LLC. There is no other provider using this location: 90 Brainard Rd Ste 105 Hartford, CT 06114."

38.     As a result of successfully completing this enrollment application, CORTNEY DUNLAP PC LLC was assigned a second Medicaid billing provider identification number, ending in 148.

39.     DUNLAP does not maintain a website or a social media presence for his counseling services. Based on my training and experience, this is uncommon for behavioral health providers as it inhibits the means by which patients can contact a counselor about prospective services.

**III.    THE INVESTIGATION OF DUNLAP'S CLAIMS TO MEDICAID**

40.     On or about March 25, 2020, agents from HHS-OIG performed a proactive data analysis of summary claims data for Connecticut health care providers who had billed the Medicaid program for CPT Code 90837 "Psychotherapy, 60 minutes with patient and/or family member." The time period reviewed was for paid dates of service from January 1, 2020 through March 25, 2020.

41.     The Medicaid data indicated that CORTNEY DUNLAP LPC LLC (the Medicaid provider number ending in 148) was paid a total of approximately $112,609[1] for psychotherapy services purportedly provided during this time period, and that CORTNEY DUNLAP LPC LLC was the seventh highest paid provider in the state of Connecticut for CPT Code 90837.  In addition, CORTNEY DUNLAP's individual practice (his Medicaid provider number ending in 143) was paid a total of $90,466 for psychotherapy services purportedly provided during this time period, and was the tenth highest-paid Medicaid provider in Connecticut for these services. During this time, the highest overall provider was a behavioral health clinic that was paid a total of approximately $316,490.  When the amounts paid to DUNLAP's two provider numbers are combined, Medicaid's total payments of approximately $203,075 to DUNLAP made DUNLAP the second-highest paid Medicaid provider in Connecticut for CPT Code 90837.

42.     Agents from HHS-OIG then obtained Medicaid claims data for the total amount paid to DUNLAP's two provider numbers from January 1, 2017 through March 19, 2020.  A review of the claims data for this period revealed that Medicaid paid approximately the following amounts to DUNLAP for services provided during each month indicated from January 1, 2019 through March 19, 2020:

| Month Services Were Provided | Medicaid Payments To DUNLAP |
| --- | --- |
| Jan. 2019 | $ 17,850 |
| Feb. 2019 | $ 17,248 |
| Mar. 2019 | $ 19,244 |
| Apr. 2019 | $ 20,371 |
| May 2019 | $ 24,612 |
| June 2019 | $ 24,442 |
| July 2019 | $ 30,255 |
| Aug.2019 | $ 35,245 |
| Sep. 2019 | $ 42,377 |

---

[1] The dollar figures in this affidavit round all figures down to the nearest dollar.

| | |
|---|---|
| Oct. 2019 | $  47,512 |
| Nov. 2019 | $  47,693 |
| Dec. 2019 | $  50,291 |
| Jan. 2020 | $  75,747 |
| Feb. 2020 | $ 237,935 |
| Mar. 2020 | $ 270,452 |
| GRAND TOTAL: | $961,289 (as of March 19, 2020) |

43.    Further analysis of the claims data revealed that from January 1, 2017 through March 19, 2020, all of the claims DUNLAP submitted to Medicaid were for either psychiatric evaluations (CPT Code 90791), or for 60-minute sessions of individual psychotherapy (CPT Code 90837).   DUNLAP is listed as the only performing provider for all of these claims, indicating that DUNLAP personally performed all of these services.

44.    On April 20, 2020, agents from HHS-OIG requested updated Medicaid claims data for DUNLAP's two Medicaid provider numbers through April 4, 2020.  The updated claims data revealed that Medicaid payments to DUNLAP for psychotherapy services purportedly provided during March 2020 totaled approximately $341,984.  In addition, DUNLAP was paid approximately $19,115 for dates of service from April 1, 2010 through April 4, 2020.  Again, all of the claims to Medicaid stated that DUNLAP personally performed all of these services.

**A.    DUNLAP Repeatedly Billed Medicaid For Having Provided Far More Than 24 Hours Of Psychotherapy On A Single Day**

45.    A review of the claims data revealed that on 67 dates of service between January 1, 2020 and April 4, 2020 (a period of 94 days), using CPT Code 90837, DUNLAP billed Medicaid for purportedly providing psychotherapy services that exceeded 24 hours in a day, including dates that DUNLAP purportedly provided more than 100 hours of service.  All of these services were listed as being performed by DUNLAP himself.  Assuming that DUNLAP provided only the minimum 53 minutes of psychotherapy that the APA considers sufficient to

bill for the 60-minute CPT Code 90837 every time DUNLAP billed that code, the total number

of hours billed on these dates were as follows:

| Total Hours Billed On One Day for 90837 | Number of Days Billed For This Hour Range |
|---|---|
| >150 | 9 |
| 100-149 | 18 |
| 50-99 | 20 |
| 24-49 | 20 |
| TOTAL: | 67 |

46.     These total hours billed just for CPT Code 90837 do not include any time

allowance for the claims DUNLAP submitted during this same date range (January 1, 2020 to

April 4, 2020) using CPT Code 90791 (Psychiatric Diagnostic Evaluation).  During this time

period, DUNLAP billed for a total of 106 psychiatric diagnostic evaluations on the 67 days noted

above.  Although there is a not a time component for CPT Code 90791, as described above in

paragraph 26, a psychiatric evaluation involves a detailed history and development of a plan of

care, which would require that the provider spend a substantial amount of time with the

provider's new patient.

47.     It is also significant that the vast majority of the claims DUNLAP submits to

Medicaid indicate that the location where the psychiatric services were provided was the

patient's residence.  So DUNLAP would also need additional time to travel between the patient's

residences on any given day. Although there is some indication that some of the patients reside at

the same address as other patients billed on a particular day, the travel time on any given day still

would require DUNLAP to spend time traveling between patients' residences.

48.     According to records obtained from the Connecticut Department of Labor, for the

first quarter of 2020, in addition to DUNLAP himself, CORTNEY DUNLAP LPC LLC has 8

employees who were paid wages during the quarter.  The amounts paid to these employees

during the quarter range from $34.20 to $10,710, with seven of the 8 paid less than $5,000 for the quarter. Two of the employees have a last name ending in Dunlap (one is hyphenated). According to records from the Connecticut Department of Public Health, none of the 8 employees is licensed to provide psychotherapy, and none of them is a provider enrolled in the Connecticut Medicaid program. As a result, none of the 8 employees could have provided psychotherapy under Connecticut state law or Medicaid regulations.

49.     At least 5 of the 8 employees were at some time Medicaid beneficiaries, and DUNLAP billed Medicaid for having provided psychotherapy or diagnostic evaluations to these 5 on various dates ranging from September 26, 2018 to April 2, 2020. Medicaid paid DUNLAP a total of approximately $31,184 for these services.

50.     According to records obtained from the Connecticut Department of Labor, in the fourth quarter of 2019, in addition to DUNLAP himself, CORTNEY DUNLAP LPC LLC had 6 employees who were paid wages during the quarter. DUNLAP was the only employee who received more than $5,000 in wages for the quarter. In the fourth quarter of 2018, DUNLAP paid himself wages of $34,846.

51.     According to records obtained from the Connecticut Department of Labor, CORTNEY DUNLAP LPC LLC did not pay any wages to any employees in the second or third quarters of 2019, and paid wages only to DUNLAP himself in the first quarter of 2019, in the amount of $3,200.

**B.      DUNLAP Billed Medicaid For Performing Psychotherapy On Dates That DUNLAP Was Out Of The Country**

52.     I have examined travel records obtained from Norwegian Cruise Lines showing that DUNLAP traveled to the Bahamas in July 2019. On July 15, 2019, DUNLAP departed New York City on a cruise ship to the Bahamas. He returned to New York City on July 20, 2019.

14

Despite the fact that he was out of the country, DUNLAP billed Medicaid for having personally provided 48 sessions of 60-minute of psychotherapy to 33 patients between July 16, 2019 and July 19, 2019. All of these claims stated that the psychotherapy sessions were provided at the particular patient's home.

53.     The 33 patients to whom DUNLAP purportedly provided psychotherapy sessions while he was out of the country included claims for 6 sessions of 60-minute psychotherapy that DUNLAP purportedly personally provided to four different children under the age of five.

54.     In addition, travel records obtained from Norwegian Cruise Lines revealed that three of DUNLAP's relatives, all of whom were enrolled as Medicaid recipients, were on the same cruise ship to the Bahamas. DUNLAP billed Medicaid and was paid for purportedly rendering three sessions of psychotherapy to two of his relatives that were on the cruise ship. DUNLAP was also paid during this time for personally providing psychotherapy to three other family members who are Medicaid recipients, but according to travel records were not present on the cruise ship.

### C.     DUNLAP Billed Medicaid For Providing Psychotherapy To Patients On Dates When The Patients Were Inpatients At A Hospital

55.     As part of our investigation, DSS reviewed Medicaid claims data to determine whether DUNLAP billed Medicaid for purportedly providing psychotherapy to any Medicaid member while the member was admitted as an inpatient at a hospital. The claims data revealed that DUNLAP has been paid $3,312 for rendering 35 sessions of 60-minute psychotherapy to five patients who were admitted as inpatients at a hospital on the date the psychotherapy was purportedly provided. DUNLAP was also paid $103 for personally providing a psychiatric evaluation to a Medicaid patient on a date that the Medicaid patient was in the hospital. The

place of service code for all 36 claims billed by DUNLAP listed the service as being rendered in the patient's homes.  DUNLAP was also listed as the sole performing provider for these services.

56.     One such Medicaid patient that DUNLAP billed for was an inpatient at a local hospital for thirty-six days.  A review of the patient's medical records revealed that the patient was involved in a shooting and underwent major surgical procedures on January 28, 2020.  The patient was subsequently admitted to the intensive care unit (ICU) for approximately three weeks.  During this time that the patient was in the ICU, DUNLAP billed for rendering a psychiatric evaluation to the patient at the patient's home on February 12, 2020.  DUNLAP then continued to bill for this patient for 60-minute sessions of psychotherapy on dates of service from February 13, 2020 through February 25, 2020, while the patient remained an inpatient at the hospital.  The patient was discharged from the hospital on February 26, 2020.

57.     Our investigation identified an additional Medicaid patient who suffered a heart attack and was admitted to a hospital on February 2, 2020.  The patient remained at the hospital for two weeks and was discharged on February 16, 2020.  DUNLAP billed Medicaid for four sessions of 60-minute psychotherapy purportedly provided to this patient at the patient's home while the patient was an inpatient in the hospital.

**D.     DUNLAP Billed An Inordinate Number Of Services Purportedly Provided Every Day To 44 Patients**

58.     DUNLAP billed Medicaid for having provided an initial psychiatric diagnostic evaluation (CPT Code 90791) to 45 different Medicaid patients on the same day, February 12, 2020.  DUNLAP had not previously billed Medicaid for having provided any services to any of these patients.  DUNLAP then billed Medicaid for purportedly providing a 60-minute psychotherapy session to 44 of these 45 patients on every single day for the next 36 days, February 13, 2020 to March 19, 2020.  Aside from the fact that the services for these 44 patients

exceeded 24 hours of services provided on each of these days, based on my training and experience, I know that any behavioral health clinician who provided psychotherapy sessions to a patient for several days in a row would ordinarily consider that patient as probably requiring admission to an inpatient treatment facility.

### E.   The Vast Majority Of The Patients DUNLAP Billed To Medicaid Had The Same Diagnosis Code

59.     As part of the claim information submitted to Medicaid, behavioral health clinicians must provide a diagnosis code indicating the condition for which the psychotherapy was provided to the patient.  The vast majority of the patients DUNLAP billed to Medicaid had the same diagnosis code: "F331 – Major depressive disorder, recurrent, moderate."  Based on my training and experience, even allowing for the prevalence of depression disorders, it is highly unlikely that such a high percentage of patients had the same underlying psychiatric diagnosis or suffered from the same medical or psychiatric condition.

### F.   Interviews of Patients Confirm That DUNLAP Has Billed Medicaid For Services That DUNLAP Did Not Provide

60.     As part of our investigation, agents interviewed an individual identified herein as CW-1.  CW-1 is the mother of a son identified herein as Child-1.  During the interview, CW-1 stated that Child-1 was in Parris Island, South Carolina for the United States Marine Corps Recruit Training. Child-1 left for Recruit Training on January 13, 2020 and has not been home during the relevant time period. CW-1 stated she has never heard the name "CORTNEY DUNLAP" before. CW-1 and Child-1 reside in Guilford, Connecticut and CW-1 stated they would never travel to Hartford, Connecticut to receive counseling services due to the travel distance. When agents asked CW-1 whether Child-1 had received 37 sessions of psychotherapy on days from February 12, 2020 through March 19, 2020, CW-1 adamantly stated, "That cannot

be correct." According to Medicaid, DUNLAP billed for and was paid approximately $3,509 for purportedly personally providing psychotherapy sessions to Child-1 on 37 dates of service between February 12, 2020 and March 19, 2020, while Child-1 was at Recruit Training.

61.     As part of our investigation, on June 10, 2020 agents interviewed an individual identified herein at CW-2.  CW-2 stated that CW-2 had previously received psychotherapy from DUNLAP beginning in January 2015.  CW-2 stated that in 2015, CW-2 met with DUNLAP for counseling once a week or once every other week.  CW-2 never met with DUNLAP more than once a week.  CW-2 stated CW-2 saw DUNLAP for counseling for a couple of months until early spring 2015.  CW-2 believed that DUNLAP must have "dropped" CW-2 as a patient.  CW-2 was not sure why CW-2's appointments with DUNLAP abruptly stopped as CW-2 did not receive a phone call or email.

62.     In June 2015, CW-2 moved to CW-2's current address in Unionville, Connecticut. CW-2 has found a new counselor in Bristol and has been going there for counseling appointments for about four years.  CW-2 is treated by CW-2's new counselor once a week or once every other week.  CW-2 stated that CW-2 has not seen CORTNEY DUNLAP since CW-2 moved to Unionville.

63.     Agents showed CW-2 a spreadsheet of claims DUNLAP submitted to Medicaid for psychotherapy services DUNLAP purportedly personally provided to CW-2.  The spreadsheet indicated that DUNLAP billed Medicaid for psychotherapy services DUNLAP to CW-2 from January 16, 2015 to July 1, 2015.  Agents pointed out to CW-2 that DUNLAP had also submitted claims to Medicaid for having personally provided a psychiatric diagnostic evaluation to CW-2 on January 27, 2020, and then billed for having personally provided approximately 50 sixty-minute psychotherapy sessions to CW-2 from January 28, 2020 through

April 3, 2020.  CW-2 stated that since moving in June 2015, CW-2 had not seen DUNLAP.

CW-2 further stated that CW-2 had not seen DUNLAP for counseling in 2020.  CW-2 also stated

that CW-2 has never been diagnosed by DUNLAP or any other provider as having Major

Depressive Disorder, as stated in the claims DUNLAP submitted to Medicaid.

64.    As part of our investigation, on June 22, 2020, agents interviewed an individual

identified herein at CW-3.  CW-3 stated that CW-3 occasionally receives counseling sessions

from the Wheeler Clinic.  CW-3 stated that CW-3 has never received counseling from

CORTNEY DUNLAP, and does not know who CORTNEY DUNLAP is.  CW-3 recalled that at

one point, CW-3 lost her wallet which had CW-3's Medicaid ID card in it, but could not recall

when this might have happened.

65.    Agents showed CW-3 a spreadsheet of claims DUNLAP had submitted to

Medicaid for psychotherapy services DUNLAP purportedly personally provided to CW-3.  The

agents showed CW-3 that DUNLAP had billed Medicaid and been paid for purportedly

personally providing a psychiatric diagnostic evaluation to CW-3 on March 22, 2016, and had

billed Medicaid and been paid for personally providing a sixty-minute psychotherapy session ot

CW-3 on March 24, 2016.  The agents also showed CW-3 that DUNLAP had billed Medicaid for

purportedly personally providing another psychiatric diagnostic evaluation to CW-3 on January

27, 2020 and purportedly personally providing approximately 67 sixty-minute sessions of

psychotherapy from January 28, 2020 through April 22, 2020.  After reviewing the spreadsheet,

CW-3 stated, Oh my God!" and that CW-3 had never received any of these counseling services

from DUNLAP.  CW-3 stated that if CW-3 had gone to any of these appointments, someone

would have had to watch CW-3's son.

66.     As part of our investigation, agents also interviewed an individual identified herein at CW-4. Agents attempted to contact CW-4 by calling the phone number associated with his Medicaid recipient identification number. Agents spoke with CW-4's mother who stated she lives with CW-4 and that CW-4 does not receive counseling services. CW-4's mother also stated that CW-4 "wouldn't go if you paid him," referring to receiving counseling sessions. CW-4's mother provided the agents with CW-4's phone number so that they could contact him directly. Agents subsequently spoke with CW-4 later that day. CW-4 advised that he was familiar with the name "CORTNEY DUNLAP" because DUNLAP is CW-4's stepfather. Agents inquired if CW-4 was currently receiving counseling from DUNLAP, to which CW-4 audibly laughed and stated that he had not been receiving counseling from DUNLAP. According to Medicaid, DUNLAP billed for and was paid approximately $4,456 for psychotherapy services purportedly provided to CW-4 on 47 dates of service from January 27, 2020 through March 19, 2020.  Following this interview, agents determined that DUNLAP billed Medicaid for purportedly personally providing 22 additional sessions of sixty-minute psychotherapy to CW-4 between March 24, 2020 and April 22, 2020.

67.     As part of our investigation, agents also interviewed an individual identified herein at CW-5. Agents asked CW-5 if the name "CORTNEY DUNLAP" was familiar to him. CW-5 vaguely remembered the name and believed he may have seen DUNLAP for counseling services five or six years ago. However, CW-5 stated that CW-5 currently sees a different individual in Hartford, Connecticut for counseling services. CW-5 has had a standing counseling appointment with this different provider every Thursday at 5:00 PM for the past couple years. CW-5 stated he has not seen or received services from any other counselor over the last three months. When agents asked CW-5 if CW-5 had received 47 sessions of psychotherapy from

20

January 27, 2020 through March 19, 2020, CW-5 stated this was "not true" and that he did not receive those services. According to Medicaid, DUNLAP billed for and was paid approximately $4,456 for psychotherapy services purportedly provided to CW-5 on 47 dates of service from January 27, 2020 through March 19, 2020.

68.     As part of our investigation, agents also interviewed an individual identified herein as CW-6 and CW-6's mother. CW-6's mother sought counseling for CW-6 after CW-6 had been severely injured in a motorcycle accident. CW-6's mother conducted online research and identified CORTNEY DUNLAP LPC as a potential counselor for CW-6. CW-6's mother was told that a counselor would come to their residence to meet with CW-6. CW-6's mother assumed that DUNLAP would be the one to meet with CW-6, but a female named "Ebony" (whom we believe to be DUNLAP's sister) came to their house instead. CW-6 stated that his first appointment with Ebony was on May 8, 2018 as CW-6 still had documents in his possession stating this. According to CW-6, Ebony came to the residence and met with CW-6 five or six times. The sessions initially last thirty minutes, and then decreased to fifteen or twenty minutes. Ebony often showed up late to her scheduled appointments with CW-6 or cancelled them. CW-6 met with Ebony once a week and the appointments concluded in the summer of 2018. CW-6 stated he did not meet with Ebony more than ten times. CW-6's mother stated that the counseling services performed by Ebony were "very poor" and did "more harm than good" for CW-6. According to CW-6, CW-6 has never met or spoken with CORTNEY DUNLAP. Agents informed CW-6 that CW-6's Medicaid identification number was billed for approximately 165 counseling sessions with DUNLAP, including psychotherapy sessions purportedly provided by DUNLAP on 35 dates of service from February 12, 2020 to March 19, 2020. CW-6's mother reiterated that CW-6 never met with Ebony more than ten times. According to Medicaid,

21

DUNLAP billed for and was paid approximately $4,456 for psychotherapy services DUNLAP

purportedly provided to CW-6 on 47 dates of service from January 27, 2020 through March 19,

2020. In total, DUNLAP was paid over $15,932 for psychotherapy services purportedly provided

to CW-6 on 168 different dates of service from May 8, 2018 through April 3, 2020.

## IV.  DUNLAP'S FRAUDULENT SCHEMES INVOLVING INSPIRATIONAL CARE AND KEYS PROGRAM

69.     As stated above, the business offices of CORTNEY DUNLAP and CORTNEY

DUNLAP LPC LLC are located at 90 Brainard Road, Suite 105, Hartford, Connecticut.  In

addition to these two businesses, two other organizations associated with DUNLAP are located

in that same business suite:

(a)     Inspirational Care, Inc. ("Inspirational Care"):  This organization is a home care

provider with the Connecticut Department of Developmental Services (DDS) and

DSS, and purportedly provides in-home and community-based services to assist

individuals with disabilities, including learning disabilities, autism, cerebral palsy,

and epilepsy.  According to the Provider Profile on file with DDS, Inspirational

Care is located at 90 Brainard Road, Suite 105, and CORTNEY DUNLAP is the

Director and main contact for Inspirational Care.

(b)     KEYS Program Inc. ("KEYS Program"): According to an online National

Provider Identification (NPI) Profile site, KEYS Program is a health care provider

classified under the taxonomy "behavioral health and social service provider" as a

"multi-specialty group" which is defined as "a business group of one or more

individual practitioners, who practice with different areas of specialization."  Dr.

CORTNEY DUNLAP Ed.D is listed as an "authorized official" of KEYS

Program.

22

In January 2020, DUNLAP attempted to enroll KEYS Program as a provider in the Medicaid program as a behavioral health clinician group located at 90 Brainard Road Suite 105 in Hartford. DUNLAP identified KEYS Program as a subsidiary of INSPIRATIONAL CARE.  On March 10, 2020, DSS denied KEYS Program's provider application.

70.     DUNLAP operates group homes in at least five locations in Connecticut.  On various occasions, DUNLAP has represented that the purpose of some of these locations is to provide residences for women and children who may be victims of domestic abuse or violence. These homes were originally operated by an entity called House of Inspiration, which transitioned into Inspirational Care.  In approximately January 2020, DUNLAP shifted the operation of these homes to KEYS Program.

71.     Our investigation has learned that as part of his health care fraud scheme, DUNLAP used Inspirational Care and KEYS Program to further his health care fraud scheme. Specifically, DUNLAP submitted claims to Medicaid for psychotherapy services purportedly provided to employees of Inspirational Care that in fact were never provided.  In addition, DUNLAP used Inspirational Care to submit fraudulent claims to Medicaid under the provider number of a licensed clinical social worker contracted by Inspirational Care to provide psychotherapy services to residents of multifamily dwellings operated or leased by KEYS Program. Furthermore, DUNLAP has used Inspirational Care and KEYS Program to obtain personal identification information from Inspirational Care and KEYS Program residents, and then billed Medicaid for psychotherapy services that were never provided to the residents, without the residents' knowledge or consent.   In recent months, DUNLAP has required residents of group homes operated by KEYS Program to receive psychotherapy services as a condition of

their residence, and billed Medicaid for these services, and for fraudulent services that the residents never received.

### A.     DUNLAP Fraudulently Billed Medicaid For Psychotherapy Services Purportedly Provided To Inspirational Care Employees

72.     As part of our investigation, agents interviewed an individual identified herein as CW-7. CW-7 stated CW-7 has been employed by Inspirational Care for approximately the past two or three years as a homemaker companion/recovery assistant, and is paid minimum wage. CW-7 currently receives "talk therapy" from a counselor unrelated to CORTNEY DUNLAP, and has seen that counselor for approximately three years. During the interview, agents showed CW-7 a spreadsheet of Medicaid claims showing that DUNLAP submitted claims to Medicaid for approximately 51 sessions of psychotherapy services DUNLAP purportedly provided to CW-7 from January 27, 2020 through April 1, 2020. When shown the spreadsheet of these claims, CW-7 was visibly shocked by this information and stated CW-7 has never seen DUNLAP for counseling, nor has CW-7 ever been diagnosed by DUNLAP with Major Depressive Disorder, as stated in the claims DUNLAP submitted to Medicaid. CW-7 was unaware that DUNLAP was a Licensed Professional Counselor. Our investigation has learned that after the date of our interview of CW-7, DUNLAP billed Medicaid for purportedly providing approximately 18 additional sessions of psychotherapy to CW-7 on every day between April 5, 2020 and April 22, 2020.

73.     CW-7 stated that when CW-7 applied for employment at Inspirational Care in or around July 2018, CW-7 believes CW-7 provided CW-7's name, date of birth, and Social Security number. CW-7 does not believe CW-7 provided CW-7's Medicaid identification number as part of CW-7's application.

74.     As a participating provider in the Medicaid program, DUNLAP was able to search an online database at a website maintained by DSS and a Medicaid contractor, DXC Technologies, to determine whether an individual is insured by the Medicaid program. DUNLAP was able to do this using an individual's date of birth or Social Security number. Our investigation has learned that DUNLAP looked CW-7 up on the website on February 12, 2020, and verified that CW-7 was insured by Medicaid. Our investigation has further learned that on that same day, DUNLAP also looked up another Inspirational Care employee identified by CW-7 as a former employee of Inspirational Care.

75.     As part of our investigation, agents interviewed an individual identified herein as CW-8. CW-8 stated that CW-8 had been diagnosed as suffering from Major Depressive Disorder, and had obtained counseling for this condition with two different counselors. CW-8 kept this information very private, and did not disclose CW-8's condition to anyone except close family members. No one at Inspirational Care knew of CW-8's condition.

76.     CW-8 stated that around September of 2019, DUNLAP offered CW-8 a job as a mentor at Inspirational Care. CW-8 filled out a job application at Inspirational Care, and was hired as a mentor. CW-8 stated that CW-8 provides mentoring services to three children for Inspirational Care. CW-8 stated that although CW-8 was employed by Inspirational Care, CW-8's paychecks for CW-8's Inspirational Care employment came from CORTNEY DUNLAP LPC. According to CW-8, Inspirational Care was underpaying CW-8 and was cheating CW-8 out of money.

77.     During the interview, agents showed CW-8 a spreadsheet of claims DUNLAP had submitted to Medicaid for 51 psychotherapy sessions DUNLAP had purportedly personally provided to CW-8 from January 27, 2020 to April 2, 2020. CW-8 stated that CW-8 never

25

authorized DUNLAP to provide psychological services to CW-8 and never authorized DUNLAP to use CW-8's Medicaid number. CW-8 stated that CW-8 never received psychological services from DUNLAP. CW-8 did not receive the 51 sixty-minute counseling sessions that were listed. CW-8 stated CW-8 never received services from DUNLAP and would never get services from an employer. CW-8 stated that CW-8 never provided CW-8's Medicaid number to DUNLAP or to Inspirational Care. CW-8 stated that DUNLAP should not have CW-8's Medicaid number.

78.     As part of our investigation, agents interviewed an individual identified herein as CW-9. CW-9 stated CW-9 is not currently seeing any counselor and has not received any psychological counseling. CW-9 stated that the last time CW-9 received counseling was through the Connecticut Department of Children and Families (DCF) for postpartum depression after CW-9's son was born.

79.     CW-9 stated that CW-9 first began working for Inspirational Care over five years ago when the company first started. CW-9 stated that CW-9 provides personal care, independent living skills, and home and companion services to approximately three clients for Inspirational Care. CW-9 stated that when CW-9 applied for a job with Inspirational Care, CW-9 provided CW-9's date of birth, Social Security Number, and driver's license.

80.     As part of our interview, agents showed CW-9 a spreadsheet of claims DUNLAP had submitted to Medicaid for psychotherapy services DUNLAP purportedly personally provided to CW-9. The spreadsheet showed that between January 27, 2020 and March 22, 2020, DUNLAP had billed Medicaid for purportedly personally providing a psychiatric diagnostic evaluation and 68 sessions of sixty-minute psychotherapy sessions to CW-9. CW-9 reviewed the spreadsheet, and said "What the fuck? Are you kidding me?" CW-9 stated that CW-9 has never

been diagnosed with Major Depressive Disorder by DUNLAP, as indicated in the claims data.

CW-9 stated that CW-9 was not aware that DUNLAP was a counselor.

81.   Our investigation has learned that DUNLAP looked CW-9 up on the DSS/DXC

Technologies website on February 12, 2020, and verified that CW-9 was insured by Medicaid.

> **B.**   **DUNLAP Bills Medicaid For Fraudulent Services Through Inspirational Care Using Another Health Care Provider's Medicaid Provider Number Without The Provider's Knowledge Or Consent**

82.    As a result of our investigation of DUNLAP, the Connecticut Medicaid program

suspended DUNLAP as a Medicaid provider on or about April 28, 2020.  As a result of this

suspension, although DUNLAP is still able to submit claims to Medicaid, Medicaid suspends

any payments and does not pay DUNLAP for any claims he may submit.  Medicaid notified

DUNLAP of this suspension at approximately the same time that agents executed a search

warrant at DUNLAP's offices at 90 Brainard Road, Suite 105 in Hartford on May 7, 2020.

83.   Following his suspension, DUNLAP approached a licensed clinical social worker,

(LCSW) identified herein as LCSW-1.  LCSW-1 has been a licensed LCSW for approximately

ten years, and operates a private practice in Manchester, Connecticut.

84.   In May 2020, DUNLAP contacted LCSW-1 and asked LCSW-1 to provide group

psychotherapy services to individuals for Inspirational Care and KEYS Program.  DUNLAP told

LCSW-1 that KEYS Program's objective was to provide skills and education to women housed

at group homes to enable them to sustain themselves and take care of their children.  According

to LCSW-1, DUNLAP views the homes as transitional homes for the women.  According to

LCSW-1, DUNLAP told LCSW-1 that he wanted an LCSW to provide therapeutic services

(which LCSW-1 stated was a term equivalent to psychotherapy) to the KEYS Program residents,

as DUNLAP had gotten into trouble for billing things wrong. DUNLAP told LCSW-1 that

DUNLAP was audited by the state for past billed services. In light of the COVID-19 pandemic, the group psychotherapy services would be provided to the KEYS Program residents via Zoom.

85.     LCSW-1 agreed to provide the services and completed a W-9 form with LCSW-1's EIN number. According to LCSW-1, LCSW-1 is a 1099 contractor and not an employee of the business. LCSW-1 receives a flat rate for each group session LCSW-1 conducts.

86.     On May 15, 2020, DUNLAP associated LCSW-1 as a provider with Inspirational Care through a Connecticut Medicaid website, and obtained a Medicaid Provider Number for LCSW-1 under Inspirational Care.

87.     According to LCSW-1, LCSW-1 decided to have a face-to-face meeting with the KEYS Program residents prior to providing the group counseling sessions, so that LCSW-1 could meet the clients, understand their situations and needs, and provide them with the ground rules of group therapy. According to LCSW-1, LCSW-1 traveled to five locations where KEYS Program operated group homes: two locations in Hartford, and homes in Waterbury, Bristol, and Cromwell. Two employees of KEYS Program, including DUNLAP's sister, accompanied LCSW-1 to the meetings. These initial face-to-face meetings were held on June 5 and 6, 2020, and involved a total of 19 women at the various group homes. This was the first time LCSW-1 had any contact with the KEYS Program residents, and the first time LCSW-1 performed any services for Inspirational Care or KEYS Program.

88.     LCSW-1 subsequently held group psychotherapy sessions with the KEYS Program residents via Zoom. These sessions were held on Fridays and Saturdays, with two group sessions on each of those days. LCSW-1 conducted these sessions on Fridays and Saturdays because LCSW-1 did not see patients in LCSW-1's private practice on those days.

89.     DUNLAP submitted claims to Medicaid through Inspirational Care for psychotherapy services purportedly provided by LCSW-1.

90.     On June 30, 2020, agents interviewed LCSW-1, and showed LCSW-1 a spreadsheet of claims DUNLAP submitted to Medicaid through Inspirational Care for psychotherapy services purportedly provided by LCSW-1.  The spreadsheet showed that DUNLAP had billed Medicaid for psychotherapy services purportedly provided to KEYS Program residents on May 15, 16, 22, and 23, 2020.  LCSW-1 denied that LCSW-1 had provided these services, and stated that LCSW-1 had not met with any residents before June 5-6, 2020.

91.     The agents asked LCSW-1 if LCSW-1 had seen 45 patients per day, the number that were billed and listed on the spreadsheet.  LCSW-1 replied, "A day?  Wow, that's not right." LCSW-1 reiterated that LCSW-1 had only 19 KEYS Program clients, and recognized some of the patient names billed for services, but not all of the names.  LCSW-1 stated that LCSW-1 "can't have that all under" LCSW-1's name, and asked how to correct the billing and what would happen to LCSW-1's name.  LCSW-1 stated that DUNLAP had told LCSW-1 that DUNLAP had some dates wrong for services DUNLAP had billed for the work LCSW-1 performed and that DUNLAP needed to fix them.  LCSW-1 felt nervous about the Medicaid funds billed that were not performed, and said LCSW-1 runs a squeaky clean business and cannot have this.  The agents showed LCSW-1 a list of 45 names of patients that Inspirational Care had billed as having received psychotherapy services from LCSW-1.  LCSW-1 reviewed the list, and indicated to the agents 16 patients for whom LCSW-1 had actually provided services, and stated that there were three additional patients whose names were not on the list.

92.     At the conclusion of the interview on June 30, 2020, agents respectfully asked LCSW-1 not to contact DUNLAP about these issues, as they were conducting a federal criminal investigation.

93.     On the morning of July 10, 2020, agents again interviewed LCSW-1 at LCSW-1's residence.  The agents had attempted to contact LCSW-1 on July 8, 2020, and left a voice mail message for LCSW-1 on LCSW-1's cell phone.  The agents called LCSW-1 on July 9, 2020, and LCSW-1 did not answer.  When the agents arrived on July 10, 2020, LCSW-1 stated LCSW-1 had just gotten off the phone with DUNLAP, and that DUNLAP was "very aware" of the billing issues the agents had previously discussed with LCSW-1.  Although the agents had respectfully asked LCSW-1 not to contact DUNLAP, LCSW-1 did contact DUNLAP about the agents' previous visit and billing issues.

94.     The agents explained to LCSW-1 that since their last visit, they had determined that Inspirational Care had billed Medicaid for additional dates of service purportedly provided by LCSW-1 in May 2020.  The agents showed LCSW-1 a spreadsheet of these additional claims, showing dates of service between May 15, 2020 and June 13, 2020, including many psychotherapy services billed on dates of service that occurred on Sunday through Thursday.  After reviewing the spreadsheet, LCSW-1 reiterated that LCSW-1 began providing services in June, and did not provide any services in May.  LCSW-1 reiterated that LCSW-1 provided services only on Friday and Saturday in June, and not on any dates from Sunday through Thursday.

95.     LCSW-1 stated that LCSW-1 "wants the best for Cortney," because DUNLAP has a "good heart" and wants his business to succeed.  LCSW-1 stated that LCSW-1 was

concerned for the women and children in the group homes, and was worried about what will happen to their living situations.

96.     On the same day that agents interviewed LCSW-1 for the second time, July 10, 2020, Dunlap used the DSS/DXC website to zero out many, though not all, of the claims that had been submitted under LCSW-1's provider number.  After July 10, 2020, some additional claims were submitted using LCSW-1's provider number.  Even after the claims were zeroed out, INSPIRATIONAL CARE netted over $19,000 from claims submitted under LCSW-1's provider number, including claims for dates of service and patients that LCSW-1 denied that LCSW-1 provided.

**C.     DUNLAP Fraudulently Bills Medicaid For Services Purportedly Provided To Inspirational Care And KEYS Program Residents**

97.     On July 20, 2017, DUNLAP signed a multi-year lease for a multifamily home located at 104 Gillett Street in Hartford.  The lease was in the name of DUNLAP's business, Inspirational Care, LLC.  Under the terms of the lease, DUNLAP was to pay $3,000 a month, which later increased to $3,300 a month.  DUNLAP told the owner of the residence that DUNLAP planned to use the home as a shelter for homeless veterans or individuals receiving services from the department of mental retardation.  DUNLAP subsequently attempted to enroll 104 Gillett Street as a group home with DDS.  DDS denied the application.

98.     On January 2, 2018, an article on the website of the Hartford Courant stated that out of the kindness of his heart, local entrepreneur CORTNEY DUNLAP is opening a group home at 104 Gillett Street in Hartford to inspire young women.  According to article, DUNLAP would be covering the monthly rent on the home, while building the structure of a home and education center.  The article referred to DUNLAP as a founder of Inspirational Care LLC, a

home health organization. The article states that up to five women and their children would be
moving into 104 Gillett Street.

99.     On or about October 17, 2018, DUNLAP began billing Medicaid for
psychotherapy services he purportedly provided to a resident of 104 Gillett Street, identified
herein as Resident-1 and to Resident-1's son, beginning in or about August 2018.

100.    On June 19, 2020, agents interviewed Resident-1.  The agents showed Resident-1
a spreadsheet showing that for the period September 25, 2018 to April 22, 2020, DUNLAP had
billed Medicaid for 114 sessions of psychotherapy DUNLAP purportedly provided to Resident-
1, and had billed Medicaid for 79 sessions of psychotherapy to her son, who is three years old.
After reviewing the spreadsheet, Resident-1 appeared to be visibly shocked and stated that
neither she nor her son had received the services from DUNLAP or anyone else at Inspirational
Care.

101.    On June 19, 2020, agents interviewed another resident of 104 Gillett Street,
identified herein as Resident-2.  The agents showed Resident-2 a spreadsheet showing that for
the time period February 5, 2019 through April 16, 2020, DUNLAP had billed Medicaid and
been paid for personally providing approximately 118 sessions of sixty-minute psychotherapy
sessions to Resident-2.  Resident-2 stated that she never received any of these counseling
sessions from DUNLAP or any other man.

102.    Agents also showed Resident-2 a spreadsheet showing that DUNLAP had billed
Medicaid and been paid for personally performing a diagnostic evaluation of Resident-2's
daughter, who was 8 years old, on January 21, 2019,  and that DUNLAP had billed Medicaid and
been paid for personally providing 119 sessions of sixty-minute psychotherapy sessions to
Resident-2's daughter.  After reviewing the spreadsheet, Resident-2 stated that her daughter has

never received counseling services from DUNLAP or any other employee of Inspirational Care, and that DUNLAP had never met her daughter.

103.    On June 24, 2020, agents interviewed another resident of 104 Gillett Street, identified herein as Resident-3.  The agents showed Resident-3 a spreadsheet showing that for the period September 27, 2018 to February 28, 2020, DUNLAP had billed Medicaid for rendering a diagnostic evaluation of her and for approximately 147 sessions of psychotherapy DUNLAP purportedly provided to Resident-3.  Resident-3 stated that she never received any counseling sessions from DUNLAP and stated further, "I've never sat down with this man and talked about anything."

104.    Agents also showed Resident-3 a spreadsheet showing that on November 22, 2019, DUNLAP had billed Medicaid and been paid for personally performing a diagnostic evaluation of Resident-3's son, who is three years old, and that DUNLAP had billed Medicaid and been paid for personally providing 66 sessions of sixty-minute psychotherapy sessions to Resident-3's son.  After reviewing the spreadsheet, Resident-3 stated that her son had never received any counseling sessions as he is three years old, and stated that DUNLAP has "never sat down with my child, ever."

105.    On June 22, 2020, agents interviewed a resident of 104 Gillett Street identified herein as Resident-4.  Agents showed Resident-4 a spreadsheet showing that DUNLAP billed Medicaid for having personally performed a diagnostic evaluation of Resident-4 on April 15, 2019.  Resident-4 stated that she had moved into 104 Gillett Street around that time.  The agents explained that the spreadsheet showed that DUNLAP had billed and been paid by Medicaid for personally providing approximately 113 sessions of psychotherapy to Resident-4.  After

33

reviewing the spreadsheet, Resident-4 stated, "Oh my God. No!" and stated that she had never received these services.

106.   Agents also showed Resident-4 a spreadsheet showing that DUNLAP had billed Medicaid and been paid for personally providing approximately 114 sessions of sixty-minute psychotherapy sessions to Resident-4's son who was six years old.  Resident-4 stated that her son has never received counseling services in his life.

107.   On June 19, 2020, agents interviewed a resident of 104 Gillett Street identified herein as Resident-5.  Resident-5 had moved to 104 Gillett Street on or about March 10, 2020. Resident-5 went to 90 Brainard Road to sign her lease with KEYS Program.  When Resident-5 signed her lease, the office worker, subsequently identified as CORTNEY DUNLAP's sister, required Resident-5 to provide copies of the Medicaid cards for Resident-5 and her two children. Resident-5 was told she needed to provide their Medicaid cards because KEYS Program receives a "state stipend" and it was a requirement of Resident-5 and her children receiving housing.

108.   Agents showed Resident-5 a spreadsheet showing that DUNLAP billed Medicaid for having personally providing psychotherapy services to Resident-5's children.  Resident-5 reviewed the spreadsheet and stated, "Nope! Never happened!"  Resident-5 reiterated that these services were never received by her children as they have never met with CORTNEY DUNLAP, LCSW-1, or any counselor.

109.   As part of our investigation, agents have interviewed residents of other group homes operated by DUNLAP through Inspirational Care or KEYS Program.  Through these interviews, agents have learned that DUNLAP has similarly billed and been paid by Medicaid for fraudulent claims for psychotherapy services purportedly provided to residents and children

of group homes located at 808-810 Capitol Avenue in Hartford, and locations in Waterbury and Bristol.

110.     In July 2019, DUNLAP signed a three-year lease on behalf of Inspirational Care for the group home located at 808-810 Capitol Avenue in Hartford.  The monthly rent was to be $5,000.  Because some of the apartments at that location were not yet completed, the monthly rent was initially $1,667, which changed to $5,000 in February 2020.  Similar to the residents of 104 Gillett Street described above, DUNLAP billed Medicaid for psychotherapy services he purportedly personally provided to residents of 808-810 Capitol Avenue that the residents stated they never received.  In January 2020, DUNLAP told the owners of 808-810 Capitol Avenue that he was changing the name of his business to KEYS Program, and DUNLAP and the owners signed an Amendment to the lease changing the name of the lessee to KEYS Program.

111.     Our investigation has learned that at the time residents of the group homes sign their housing agreements with Inspirational Care or KEYS Program, they are told that they must provide Inspirational Care or KEYS Program with copies of their Medicaid identification cards for themselves and their children.

112.     Our investigation has learned that recently, residents of group homes have been told by Inspirational Care and KEYS Program that as a condition of their residence, they must agree to receive psychotherapy services, and if they do not, they will be evicted.

113.     Several of the residents of the group homes who were interviewed have expressed concern that as a result of speaking to the agents, they are fearful that they will be evicted from the group homes.

114.     Our investigation has learned that in addition to fraudulently billing Medicaid for psychotherapy services purportedly provided to the residents of the group homes, DUNLAP has

also billed Medicaid for psychotherapy services DUNLAP purportedly provided to relatives of DUNLAP and their families, and used payments for these services to pay the rent for the relatives and their families.

**D.    DUNLAP Fraudulently Bills Medicaid For Services Purportedly Provided To Students Enrolled At New Haven Adult And Continuing Education Center, Where DUNLAP Is Employed**

115.    In 2017, DUNLAP began employment as a part-time counselor at the New Haven Adult and Continuing Education Center ("NHACEC"), a program which is located in New Haven and is administered by New Haven Public Schools.  DUNLAP was laid off due to budget cuts in approximately August 2018.  In February 2019, DUNLAP was rehired to a full-time position as a guidance counselor, and currently works as the Career Service Office Coordinator.  His duties in this position include the supervision of career counselors and creating classes and schedules for students.  In this capacity, DUNLAP has an office at NHACEC, and a NHACEC desktop and laptop computer.  He also has access to a NHACEC computer database that includes students' names, dates of birth, and Social Security numbers.

116.    On February 16, 2020, DUNLAP began looking up the Medicaid enrollment status of individuals who were or had been enrolled as students at NHACEC.  Two days later, DUNLAP began submitting claims to Medicaid for psychotherapy services DUNLAP had purportedly personally provided to NHACEC students.  As part of our investigation, agents have interviewed several current or former NHACEC students and asked the students whether they had ever received psychotherapy services from DUNLAP.  All of the students we interviewed told us that they had never received any psychotherapy from DUNLAP.

117.    For example, as part of our investigation, on June 2, 2020, we interviewed an individual identified herein as Student-1.  Student-1 enrolled in NHACEC in the summer of

2018.  Student-1 believes Student-1 provided Student-1's name, address, date of birth, and Social Security number when Student-1 enrolled at NHACEC.  Student-1 told us that Student-1had not seen any psychotherapy counselor in the last three or four months.

118.    Agents showed Student-1 a spreadsheet showing that DUNLAP had billed Medicaid for purportedly personally providing a diagnostic evaluation of Student-1 on January 27, 2020, and then had billed Medicaid for purportedly personally providing approximately 50 sessions of sixty-minute psychotherapy sessions to Student-1 between January 28, 2020 and March 19, 2020. Student-1 responded, "Absolutely not," and stated Student-1 had never seen DUNLAP for any counseling services.  Student-1 also stated Student-1 had never been diagnosed with Major Depressive Disorder as stated in the claims DUNLAP submitted to Medicaid.

119.    As part of our investigation, on June 2, 2020, agents interviewed an individual identified herein as Student-2.  Student-2 stated Student-2 was enrolled as a student at NHACEC in 2017 and graduated on or about December 21, 2018.  Student-2 believes Student-2 provided Student-2's name, date of birth, and Social Security number during registration.

120.    Agents showed Student-2 a spreadsheet showing that DUNLAP had billed Medicaid for purportedly personally providing a psychiatric diagnostic evaluation on January 27, 2020, and for purportedly personally providing approximately 50 sixty-minute sessions of psychotherapy to Student-2 between January 28, 2020 and April 1, 2020.  Student-2 stated "for sure, one hundred [percent]" Student-2 never saw DUNLAP for any form of counseling. Student-2 stated Student-2 has never been diagnosed by DUNLAP as suffering from Major Depressive Disorder, as stated in the claims DUNLAP submitted to Medicaid.

121.    As part of our investigation, on June 2, 2020, agents interviewed an individual identified herein as Student-3.  Student-3 stated that Student-3 is not currently seeing a behavioral health counselor, and had never received counseling or mentoring in Student-3's life.

122.     Student-3 stated that Student-3 knew DUNLAP from NHACEC.  Student-3 only knows DUNLAP as being as "school administrator."  Student-3 interacted with DUNLAP "off and on" as DUNLAP assisted Student-3 in enrolling in classes.

123.    Agents showed Student-3 a spreadsheet showing that DUNLAP had billed Medicaid for purportedly personally providing a psychiatric diagnostic evaluation of Student-3 on January 27, 2020. In response, Student-3 stated, "No, that's not right."  Student-3 also stated that Student-3 had not received approximately 51 sessions of sixty-minute psychotherapy from DUNLAP.  Student-3 stated, "I didn't receive none of them."  Student-3 recalled that DUNLAP had previously asked Student-3 for Student-3's student identification number.

124.    As part of our investigation, on June 2, 2020, agents interviewed an individual identified herein as Student-4.  Student-4 stated Student-4 attended NHACEC and received a diploma approximately two years ago.  Student-4 recalled providing Student-4's name and date of birth when Student-4 enrolled at NHACEC.

125.    Agents showed Student-4 a spreadsheet showing that DUNLAP had billed Medicaid for purportedly personally providing a psychiatric diagnostic evaluation of Student-4 on February 12, 2020, and had billed Medicaid for purportedly personally providing 40 sixty-minute sessions of psychotherapy to Student-4 between February 13, 2020 and April 2, 2020. In response, Student-4 stated, "Oh my God," and told the agents Student-4 had never received counseling from DUNLAP and was one hundred percent certain that the presented counseling

sessions never happened.  Student-4 also stated that Student-4 has never been diagnosed with Major Depressive Disorder as stated in the claims DUNLAP submitted to Medicaid.

126.    As part of our investigation, on June 2, 2020, agents interviewed an individual identified herein as Student-5.  Student-5 stated Student-5 enrolled in NHACEC in 2018 and graduated in 2019.  Student-5 recalled providing Student-5's name and date of birth to NHACEC during the registration process.

127.    Agents showed Student-5 a spreadsheet showing that DUNLAP had billed Medicaid for purportedly personally providing a psychiatric diagnostic evaluation of Student-5 on February 12, 2020 and had billed Medicaid for personally providing approximately 40 sixty-minute psychotherapy sessions to Student-5 between February 13, 2020 and April 3, 2020. Student-5 stated that the services "didn't happen," that Student-5 does not know who CORTNEY DUNLAP is, and that Student-5 never saw DUNLAP for counseling. Student-5 also stated that Student-5 has never been diagnosed with Major Depressive Disorder as stated in the claims DUNLAP submitted to Medicaid.

128.    As part of our investigation, agents interviewed the principal of NHACEC. According to the principal, NHACEC students have never been referred to CORTNEY DUNLAP for mental health counseling, and especially not for any counseling that resulted in payment to DUNLAP.  According to the principal, it would be a violation of the NHACEC employee handbook for an employee to receive payment for services to NHACEC students outside of their employment.  The principal identified a statement from the handbook that states "Faculty and staff must never solicit students to purchase items, service, or property.  This includes private academic tutoring."

129.     Our investigation has determined that DUNLAP billed Medicaid for having purportedly personally provided psychotherapy services to 136 individuals who had been enrolled at various times as students at NHACEC.  Medicaid paid DUNLAP at total of $593,383 for these services.

## V.     CONCLUSION

130.     For the reasons set forth herein, I submit that there is probable cause to believe, and I do believe, that CORTNEY DUNLAP is engaged in a health care fraud scheme to defraud Medicaid, and to commit violations of Title 18 U.S.C. §§ 1035 (false statements related to health care matters) and 1347 (health care fraud).  I respectfully request the issuance of the requested arrest warrant.

## VI.     REQUEST FOR SEALING

131.     Based on my training and experience, the disclosure of the complaint, this affidavit, and any arrest warrant at this time will jeopardize the government's ongoing investigation.  Premature disclosure of the contents of this affidavit, the complaint, and arrest warrant could frustrate this investigation by alerting the subjects of the investigation to the nature of the investigation, the techniques employed, and the evidence developed to date. Disclosure could also frustrate the investigation by limiting the use of the grand jury to develop further admissible evidence, and could affect agent safety when executing the arrest warrant.

JEFFREY
ANDERSON

Digitally signed by
JEFFREY ANDERSON
Date: 2020.10.02
06:09:31 -04'00'

Jeffrey W. Anderson, Special Agent
Office of the Inspector General
United States Department of Health and Human Services


The truth of the foregoing affidavit has been attested to me by Special Agent Anderson over the telephone this  5th  day of October, 2020.

Robert A.
Richardson

Digitally signed by Robert
A. Richardson
Date: 2020.10.05
11:05:02 -04'00'

HONORABLE ROBERT A. RICHARDSON
UNITED STATES MAGISTRATE JUDGE